UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

05 10922 NMG

MANCHESTER-ESSEX REGIONAL SCHOOL MAGISTRATE JUDGE RBC
DISTRICT SCHOOL COMMITTEE
Plaintiff

VS.

BUREAU OF SPECIAL EDUCATION APPEALS OF THE MASSACHUSETTS DEPARTMENT OF EDUCATION, MASSACHUSETTS DEPARTMENT OF EDUCATION, AND PATRICIA SPELLMAN, AS PARENT AND NEXT FRIEND OF DANIELLE TULLERCASH,
Defendants

AMOUNT $ 250
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. FDM
DATE 5/4/05

COMPLAINT FOR JUDICIAL REVIEW OF
FINAL DECISION OF STATE ADMINISTRATIVE AGENCY

Jurisdiction

1. This is a complaint for judicial review of a final decision of the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education, pursuant to 20 U.S.C. §1415(i)(2) of the Individuals with Disabilities Education Act (IDEA).

Parties

2. Plaintiff is the Manchester Essex Regional School District School Committee, a body politic and corporate as established under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 12 Story Street, Essex, Massachusetts.

3. Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education has a usual place of business at 350 Main Street, Malden, Massachusetts.

4. Defendant Massachusetts Department of Education has a usual place of business at 350 Main Street, Malden, Massachusetts.

5. Defendant Patricia Spellman, in her capacity as Parent and Next Friend of Danielle Tullercash, resides at 27 John Wise Ave, Essex, Massachusetts.

Cause of Action

6. On or about June 1, 2004, the Plaintiff, Manchester-Essex Regional School District School Committee, through a TEAM process, developed an Individualized Education Program (IEP) for the student, providing for special education and related services within both a special education and a regular education setting.

7. On or about June 8, 2004, the Defendant, Patricia Spellman, in her capacity as the Parent and Next Friend of the student, partially rejected the IEP, seeking the addition of services through a particular identified service provider; said provider operates a non-certified, non-approved program of so-called ontogenetic therapy.

7. On or about August 24, 2004 and February 23, 2005, the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education conducted an administrative due process hearing relative to the Defendant Patricia Spellman's request for the provision of the particular identified services to the student.

8. On or about April 4, 2005, the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education issued a Decision, received by the Plaintiff on May 6, 2005, wherein the Defendant Bureau of Special Education Appeals ordered the Plaintiff to provide for the immediate implementation of the requested services, using the particular identified service provider requested by the Defendant Patricia Spellman. A copy of the Decision is attached hereto as Exhibit A.

9. The Plaintiff, Manchester-Essex Regional School District School Committee, is aggrieved by the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education's Decision of April 4, 2005, in that the Decision is incorrect as a matter of law, is not supported by the preponderance of the evidence, is arbitrary and capricious, and is unwarranted by the facts on record.

WHEREFORE, the Plaintiff, Manchester-Essex Regional School Committee, prays that this Court reverse the Decision as issued by the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education, determine that the Plaintiff is not responsible, either programmatically or fiscally, for the provision of

services through the particular identified service provider, and award the Plaintiff such
other and further relief as the Court deems just and appropriate.

The Plaintiff,

MANCHESTER-ESSEX
REGIONAL SCHOOL DISTRICT
SCHOOL COMMITTEE,
By its attorney,

Thomas J. Nuttall, Esq.
Sullivan and Nuttall, P.C.
1020 Plain Street, Suite 270
Marshfield, MA. 02050
(781) 837-7428
BBO 546940

Dated:  May 4, 2005

**APRIL 4, 2005**

**COMMONWEALTH OF MASSACHUSETTS**
**BUREAU OF SPECIAL EDUCATION APPEALS**

---

**MANCHESTER-ESSEX REGIONAL SCHOOL DISTRICT**
**BSEA #04-5309**

---

**BEFORE**

**SARA BERMAN**
**HEARING OFFICER**

**THOMAS NUTTALL, ATTORNEY FOR THE SCHOOL**
**PARENT, PRO SE**

**COMMONWEALTH OF MASSACHUSETTS**
**SPECIAL EDUCATION APPEALS**

In Re: **Manchester-Essex Regional School District** **BSEA No. 04-5309**

## DECISION

This decision is issued pursuant to 20 USC Sec. 1400 et seq. (Individuals with Disabilities Education Act), 29 USC Sec. 794 (Section 504 of the Rehabilitation Act); MGL c. 71B (the Massachusetts special education statute; "Chapter 766"); MGL c. 30A (the Massachusetts Administrative Procedures Act), and the regulations promulgated under these statutes.

On June 9, 2004, Mother filed a hearing request with the Bureau of Special Education Appeals (BSEA). Mother's original hearing request, clarified before the start of the hearing, sought an order requiring the Manchester-Essex Regional School District (Manchester-Essex or School) to provide Student with nine hours per week of direct services from a particular private provider during the 2004-05 school year.

A pre-hearing conference took place on July 15, 2004. A hearing was held on August 24, 2004 at which Mother was pro se and the School was represented by counsel. Both parties examined and cross-examined witnesses and introduced documentary evidence. An additional day of hearing was held on February 23, 2005, to allow testimony of a rebuttal witness called by Mother.

Those present for all or part of the proceeding were:

| | |
|---|---|
| Student's Mother | |
| Jane Clark | Special Needs Teacher, Essex Elementary School |
| Jill Costanza | Occupational Therapist, Essex Elementary School |
| Amy Lombara | Physical Therapist, Essex Elementary School |
| Joseph Mascola | Director of Student Services, Manchester-Essex RSD |
| Kathryn Cushna | Student's paraprofessional, Manchester-Essex RSD |
| Thomas J. Nuttall, Esq. | Attorney for Manchester-Essex RSD |

The official record of the hearing consists of Parent's Exhibits 1 through 5, (each with multiple pages); School's Exhibits 1 through 40 and approximately 4 ½ hours of tape-recorded oral testimony and argument. The School filed its written closing argument on March 2, 2005 and the record closed on that day.

## ISSUES PRESENTED

Student is an eleven-year-old child with multiple, complex needs in all domains, including language and communication, cognitive functioning, mobility, fine and gross motor functioning, vision, sensory integration, social interaction, and self-care, as the result of a chromosomal abnormality known as Wolf-Hirschorn Syndrome. At all relevant times, Student has been a student in the Essex Elementary School where she has been fully or mostly included in regular classrooms with her same-aged typical peers, and has also received various related services including physical, occupational, and speech/language therapies.

The parties do not dispute Student's profile, or her eligibility for special education. At issue is whether Manchester-Essex should provide Student, during the 2004-2005 school year, with the services of the same non-766 approved private provider that provides Student's extended school year (ESY) program. The following issue was presented at hearing:

> Whether Manchester-Essex must provide Student with several hours per week of the Active Healing program during the 2004-05 school year in order to provide her with a free, appropriate public education.

## POSITION OF PARENT

Manchester-Essex clearly has endorsed the Active Healing program as it has sent Student there for her summer services every summer since 2000. Moreover, Manchester-Essex has incorporated many of the Active Healing methodologies into Student's program during past school years, and its own employees have been trained by the director of Active Healing. Student has benefited from the Active Healing program, which helps make her more alert, focused and available for learning. Student regresses when the Active Healing therapies are not provided. Student was receiving Active Healing techniques during the school day during first and second grade, but the frequency of service began to diminish during third and fourth grade. Student regressed as a direct result of the diminution of Active Healing methodologies during the school day. Because Student has now grown too big to receive Active Healing methodologies in her inclusion classroom, Manchester-Essex should transport Student to Active Healing's location in Gloucester, MA three mornings a week so that she can continue to benefit from the service, or at the very least for a twelve week trial to determine if Student is likely to so benefit.

## POSITION OF MANCHESTER-ESSEX

The Active Healing Program is not Chapter 766-approved, does not employ appropriately qualified or credentialed staff, and is not a special education or rehabilitation program that is recognized as such by professionals in those fields. Manchester-Essex has provided Student with extended school year services from the Active Healing program mainly to appease Mother. However, there is no objective

evidence to show that Student has derived benefit from the Active Healing program or is likely to in the future. In fact, some of the techniques used in the Active Healing program would be potentially harmful to Student's health. If Student has benefited from Active Healing techniques, it is because comparable techniques have been incorporated into Student's existing OT and PT services. However, the School should not be required to provide Student with unapproved services delivered by staff who are not appropriately qualified and which have not been shown to benefit Student.

**FINDINGS OF FACT**

1. Student is an eleven-year-old child who lives with her mother (Mother) and siblings in Essex. Student enjoys being with her family, as well as with large groups of other children in school, and has been described as a pleasure to have in class. Student especially enjoys her music therapy sessions. (S-5, S-8, S-13)

2. Student has a chromosomal anomaly called Wolf-Hirschorn Syndrome, which significantly affects her cognitive, motor, neurological, sensory, and communicative functioning. Specifically, Student needs assistance to walk. She has very poor vision and limited eye muscle tone. Student requires sensory stimulation and hand-over hand assistance to grasp classroom tools like pens or markers. Student is learning how to eat and drink with assistance and gets supplemental nutrition via a G-tube. Student is not toilet trained and is fully dependent for all self-care. Student has sensory issues including tactile defensiveness and needs a "sensory diet" throughout the school day to enable her to handle classroom materials, and remain alert, focused and awake. Student is non-verbal, but can communicate her needs and express pleasure or discomfort with vocalization. She performs inconsistently with assistive communication devices, and requires physical cues and hand over hand assistance to use these them. Student has made progress with her IEP goals since entering school, but that progress is very slow. (S-8)

3. Student has a history of prolonged seizures, although reportedly has had only one seizure or episode of seizures in the past three years. (S-8, P-1)

4. Mother is committed to Student's being as fully included as possible with her typically developing peers throughout her school career, including high school.

5. Student has been enrolled in the Manchester-Essex Public Schools since preschool. She has attended Essex Elementary and Middle School since kindergarten (SY 1999-2000). Student's IEPs from kindergarten to the current school year have provided for her to be included in her age-appropriate regular education classroom for most of the school day, with various modifications and accommodations to help her participate in classroom activities. Related services, including occupational therapy (OT), physical therapy (PT) and speech therapy have been provided both in individual pullout sessions and within the classroom. Student has had one special education teacher, Jane Clark, who has overseen and coordinated Student's special education services while Student has been a member of mainstream classes. (Clark, P-5).

6. Currently, Student is enrolled in a fourth grade regular education classroom at the Essex Elementary School under an IEP calling for the following pull-out services: speech /language therapy (2x30 minutes/week), physical therapy (PT) (2x60 minutes/week) "PT Hippotherapy" (1x60 minutes per week) and music therapy (1x60 minutes/week). Student also receives 30 minutes per week of in-class OT services. She has a one-to-one aide, Kathryn Cushna, who accompanies her at virtually all times. (Cushna)

7. The above-described configuration of services is similar to what Student has received since Kindergarten.

8. At various times, Student also has had various other outside activities including therapeutic horseback riding and swimming. (P-5, p. 9)

9. During her kindergarten year, (SY 1999-2000), Student participated in all kindergarten activities with support and modifications. A progress report issued in June 2000 states that Student was able to indicate preferences in a field of 2 or 3 by vocalizing or touching the object; had improved her ability to grasp objects, was able to choose an activity with picture cards or objects and could use switches or touch pads to initiate activities. Student's teacher, Jane Clark, stated that Student "has had a wonderful first year of school." (P5, p. 2) The OT progress report states that Student's sensory, fine motor, and visual/perceptual motor skills had all improved during kindergarten. A variety of techniques including proprioceptive input, deep pressure and/or cross-patterning and "Brain Gym" were helpful to Student's ability to attend to task and reduce tactile defensiveness and self-stimulatory movements. (P-5, p. 3) The speech-language report indicated that Student had learned to understand about 10 common one-step directions, could make accurate choices from a field of 2 about 60-70% of the time, showed much awareness of peers, and had increased communicative intent via vocalizing, touching and eye gaze to indicate preferences. (P-5)

10. Beginning with the summer of 2000, after Student's kindergarten year, and every summer thereafter, Student has participated in a seven-week program operated by a private provider known as Active Healing (formerly Estin & Goodchild, LLC). Manchester-Essex has funded Student's summer program with this provider. Additionally, the president of Active Healing, Sargent L. Goodchild, Jr., has provided consultation and training to Student's service providers within the Manchester-Essex Public schools over the past several years.

11. An informational brochure and Sargent Goodchild's resume describe Active Healing as a "neurodevelopmental consulting firm committed to the neurological integrity of children, especially those with learning disabilities and/or brain damage." (P-2, pp. 3-4) One of the program's premises is that all cognitive development is ultimately dependent on a child's following a typical developmental pathway to learning to navigate the environment, i.e., learning to creep, crawl, walk and run. (P-3, p. 10). In

keeping with this premise, Active Healing staff have used various techniques with Student that purport to stimulate or replicate these physical movements; one such technique is called "patterning" or "brain patterning," which entails two or more persons moving Student's arms, legs and body in particular sequences. (Clark, Costanzo, Lombara, Cushna). Active Healing also has provided other types of physical and sensory stimulation, vision therapy (which includes placing Student in a darkened room and flashing a light bulb on and off), and a home component.

12. The parties have stipulated that Active Healing is not a Chapter 766 approved provider and that Sargent Goodchild has no degree or certification in any field related to special education, physical, occupational or speech therapy, or any other education, health, or rehabilitation field. The parties also have stipulated that there are no other students from Manchester-Essex whose IEPs call for services at Active Healing. There is no evidence that Active Healing is licensed or accredited by any other agency to deliver health or rehabilitation services.

13. There is no evidence on the record indicating whether Manchester-Essex considered or offered a Chapter 766 approved ESY program as an alternative to Active Healing from 2000 to the present.

14. As stated above, Student first attended the Active Healing summer program during the summer of 2000, after her kindergarten year. There is no documentary evidence on the record to show what services she received and no written assessment of her progress during the summer program.

15. For the 2000-2001 school year, Student was placed in a regular first grade classroom, with modifications and supports. A progress report from Ms. Clark dated January 2001 states that Student "continues to improve understanding and application of cognitive skills through daily play-based and group activities." Student was developing letter recognition skills with multi-sensory materials, was being introduced to number recognition and concepts, could indicate preferences in a field of 2 or 3, could grasp and hold objects with support, and used a communication board with picture schedule. She was also continuing to develop the cognitive and pre-academic skills that she had been working on in kindergarten. (P-5) The OT report for January 2001 also reflected progress and stated that brain gym movements and patterns appeared to help Student attend to task. (P-5) The speech/language report for the same period indicates that Student was understanding colors and other class vocabulary, and showing increased eye contact with people and materials, especially after sensory-motor input. (P-5)

16. The April 2001 progress report also shows progress, including some inconsistent ability to choose letters and numbers and identify colors and shapes and improved peer relationships. (P-5) The OT report reflects "great gains" on the ability to grasp objects," decreased tactile defensiveness, allowing her to explore her environment, progress in use of two hands, in "great improvement with her ability to attend to an activity for 4-5 minutes after receiving tactile or proprioceptive input." The COTA at

the time, Linda Marshall, reported that "Full body movements on the floor to cross mid-line are done with her assistant and myself each week before tabletop activities. [Student] appears much more centered and alert after movement patterning is done. [Student] grasps objects and attends to tabletop task with better focus after receiving deep pressure, movement, and feeling different textures." The COTA went on to state that Student's largest gain is her ability to process tactile input. This may be [due] to her being exposed daily to "movement patterns on the floor where she is aware of her whole body position, movement, and tactile input." Finally, the PT report also showed good progress in strength, developmental positions, balance, and mobility. The LPTA who wrote the report, Jennifer Gallant, stated that "[Student] also attended the [Active Healing] program…for her summer school last year…This program was very beneficial for [Student] and the progress seen in her eye contact and tracking skill were notable." (P-5)

17. Student attended Active Healing during the summer of 2001, from June 25 through August 9. A Summary of results, dated August 9, 2001 and written by Sargent Goodchild, states that Student[s] program consisted of "neurodevelopmental and special education techniques to ameliorate the symptoms of her syndrome." (P-3, p. 1) The report states that Student received 91 hours of service, teaching rolling and crawling, and using "trunk patterns," as well as tactile stimulation," special education," aromatherapy, and "self-initiated rolling." (Id.) The report does not further describe these interventions.

18. The report states that Student became more alert and aware of her surroundings, improved her interactions with others, and improved her gross motor abilities. (Id.) The report further states that Student's "neurodevelopmental abilities" progressed over the summer from a 12.6 month to 14.3 month age equivalence, a gain that Goodchild characterized as "impressive." There is no evidence of what procedures, norms or criteria Active Healing used to arrive at these figures.

19. Student entered second grade in September 2001 for the 2001-02 school year, once again in an inclusion setting with pullouts for related services (OT, PT, speech-language). Progress reports for November 2001 showed that Student was continuing to develop pre-academic skills of recognizing numbers, letters, shapes and colors, and choice-making; was making progress in her ability to grasp objects and use tools, was continuing to use switch/touch pads, computer touch screen and a "cheap talker" to communicate, and was improving her mobility. (P-5, p. 9-26). The speech-language report noted that Student seemed "unwell and tired" much of the time. Student's ability to attend and perform tasks was better when she received various kinds of sensory input, including brushing and pressure. (Id.)

20. At some point during Student's second grade year, Student's TEAM consulted with Sargent Goodchild and began incorporating some of the Active Healing techniques into Student's routine. In particular, "patterning" techniques were incorporated into Student's OT sessions. (Clark)

21. During the winter of 2001, Student had an episode of seizures. Subsequently, her teachers and providers noted a "loss of previously learned skills and a decreased ability to attend and learn new skills." (S-21, p. 1) There is no evidence in the record that Manchester-Essex formally re-evaluated Student immediately after the seizures or consulted with Student's medical providers.

22. The progress reports for the latter part of the 2001-02 school year do not mention Student's regression. The report issued by Jane Clark in February 2002 showed "slow progress" in communication skills, and stated that Student would "continue to receive sensory input to focus and calm her…" (P-5, p. 29) The speech-language report by Anne Stevens states that Student showed a "higher level of movement and fatigue and a lower level of focused attention this year, but shows briefly increased attention immediately after sensory stimulation such as patterning, listening therapy, oral motor vibration stimulation and light therapy" and increased attention immediately after sensory stimulation (P-5, pp. 30, 31)

23. The next progress report for second grade was issued in April 2002. The record contains no report from the special educator or speech-language therapist. The OT report indicates "steady progress" towards goals of improving grasp, touching objects when prompted, maintaining attention and short periods of eye contact, and tool use. The COTA noted that many OT areas were being carried over by Student's aide on a regular basis, which was helpful to Student, and that Student should be re-evaluated. According to the PT report, Student's mobility had improved. (P-5, pp. 33-34)

24. In May and June 2002, Manchester-Essex conducted developmental and PT evaluations for Student as part of the three-year re-evaluation process. The developmental assessment was conducted by special education teacher Jane Clark and speech/language therapist Anne Stevens, and consisted of observations, the Hawaii Early Learning Profile (HELP)-birth to three years, and the Cayuga-Onondaga Assessment for Children with Handicaps (COACH). According to the HELP checklist, Student's cognitive/receptive language skills were in the 2-3 month range; expressive language and fine motor skills were in the 5-6 month range; social-emotional functioning was in the 4-8 month range, and self-help skills were in the 7-12 month range. (S-21)

25. The evaluation report mentions regression after the seizure activity of 2001. Informal assessment of progress towards IEP goals as reflected in the report showed that Student's ability to attend to and touch objects or pictures, respond to verbal cueing, interact socially with classmates, choose from a field of 2 objects, and grasp objects like crayons or markers had diminished over the prior year to 18 months. (S-21) The report does not specify how many skills were lost or reflect steps that were taken or should be taken to assist Student in recouping lost ground.

26. The physical therapy evaluation by PT Martha Ball, conducted in June 2001, noted that Student was then receiving two, one-hour PT sessions per week that consisted of numerous exercises, including patterning, weight bearing activities and ambulation

training (Student was not a "functional ambulator" at that time, and needed to use a wheelchair for all functional mobility.) In discussing patterning activities with Student, the PT noted that "[t] hese are the same patterns that Sarge [Goodchild] instructed us on and seem to be beneficial to [Student]" (P-5, pp. 35-37.)

27. As she did in 2001, Student attended the summer program at Active Healing for seven weeks between June and August of 2002. A report issued by Sargent Goodchild on September 2, 2002 states that Student's skills at the beginning of the summer were similar to those demonstrated at the beginning of the prior year's course, and further states that "[t] he gains made over the course of the previous year had been lost and it was necessary to start from the beginning in most areas." (P-3, p. 2). The report does not suggest a reason for the lost ground. By the end of the summer, after 97 hours of service, Student reportedly had made gains in vision, visual attention, sight word identification, and trunk strength, but not in auditory comprehension language skills. (P-3, p. 2) As was the case with the 2001 report, the report for summer 2002 does not describe all services in detail or demonstrate how Student's progress was measured.

28. Student entered third grade in September 2002. At that time she was provided with a 1:1 paraprofessional, Kathryn Cushna. Ms. Cushna has continued to serve as Student's 1:1 aide from that time to the present. Ms. Cushna assisted the physical therapist with Student's patterning approximately twice weekly for 20 minutes at a time. (Cushna)

29. On or about October 21, 2002, a Team meeting was held to discuss using Sargent Goodchild's services and/or techniques within the school setting. At that meeting, Mr. Goodchild reportedly proposed a program to increase Student's awareness of her surroundings, expand her visual acuity, improve consistency in her choice-making, and reduce bruxism. (S-16). These goals would be addressed through a program total of approximately six hours of service per week. According to Mr. Goodchild, the service should be viewed as "readiness training" for the regular curriculum, and would "integrate the brain stages responsible for receiving, storing, retrieving and comprehending her scholastic curriculum." In response to the TEAM's request for current performance levels and educational goals, Mr. Goodchild agreed to perform an assessment of Student's then-current neurodevelopmental function. (P-3, p. 12) Ms. Clark, Student's special education liaison, stated at the Team meeting that it would be a "good idea" for Student to go to Active Healing for part of the school day because there was a "lack of any other acceptable program" and because she was frustrated by Student's regression. (Clark)

30. Active Healing conducted the neurodevelopmental assessment referred to above on October 25, 2002. Team members including Robert Mascola, Director of Student Services, observed the evaluation. (Mascola). The assessments observed by Mr. Mascola included vision stimulation, which entailed flashing a light on and off in Student's eyes a few times; checking Student's startle reflex by standing behind Student, hitting a water bottle with a stick, and noting whether she blinked; cognitive

assessment consisting of purportedly having Student move her arm or leg to indicate that she was distinguishing pictures of an eagle and secretary bird, and motor functioning, consisting of placing Student on a ramp and observing her turn from front to back. (Mascola). Mr. Goodchild recorded Student's performance in terms of purported age levels as he conducted the assessments. (Mascola).

31. On October 29, 2002, Sargent Goodchild issued a written report of the October 25 evaluation. The report states that Student "exhibited the ontogenetic abilities of the average 8.4 month old child…" which represented a loss of function since her summer program had ended. Goodchild opined that Student needed to follow the "neurodevelopmental guidelines" in the program referred to in Paragraph 27, above, to enable her to progress educationally. (P-3, p. 10)

32. In a notice dated December 10, 2002, Manchester-Essex informed Mother that it declined to provide a trial of the interventions proposed by Mr. Goodchild for the following reasons: Mr. Goodchild is not certified in Massachusetts to provide therapeutic services; does not hold a degree in the field of rehabilitative therapy; [Active Healing] is not approved by Massachusetts to provide special education or related services; the proposed program does not use standardized assessment tools used by other members of the OT, PT and speech therapy programs; the TEAM members could not identify the benefits to Student or rate of her response, and also could not independently verify statements of progress made by Mr. Goodchild. (S-16)

33. The notice further stated that Student had made minimal progress in the area of motor, language and cognitive development. Manchester-Essex was willing to increase the amount of service to Student in language and motor development, wanted to explore outside placements (but Mother was unwilling to place Student privately); and, while it "would like to support [Mother's] request to provide a trial period for a therapeutic intervention by [Active Healing], it "will not support this service in light of the reasons stated above." (S-16) Finally, the notice states that the district would meet with the "parent and any third party to resolve the stated concerns," and also "continues to propose alternative therapeutic services and programs to Student." (S-16) The report states that Mother had investigated alternative placements proposed by Manchester-Essex, but does not name the proposed placements and also does not specify the increased service that it would provide to Student within her current setting.

34. Notwithstanding this notice, however, it appears that Student's providers continued to incorporate "patterning" and other techniques taught by Sargent Goodchild, although there may have been some overlap between Goodchild's techniques and standard OT and PT techniques. (Clark, Lombara)

35. Student continued in her inclusion third grade placement during 2002-2003. Progress reports issued in January 2003 show that Student had a reduced energy level because she "has been infected and/or surrounded by various viruses…", and has shown

resistance and decreased responsiveness to prompts to touch object symbols and switch activators. On the other hand, Student showed progress with weight bearing. (S-15) PT Martha Ball also indicated that certain non-desired motor responses could be inhibited with patterning on some occasions. (Id).

36. Progress reports for April 2003 indicate that Student was making slow, steady progress toward various OT goals, and inconsistent responses to cues to show preferences. Fine motor skills were assessed as scattered at the 8 month level. Student continued to make good progress in the area of ambulation. (S-14)

37. The next progress reports were issued in June 2003. The special education report stated that Student was making "slow progress" in the inclusion setting, with performance dependent on health and focus. Student continued to benefit from interaction with her peers, and was a "loved and valued member of her class and her school." Student's ability to eat and drink had progressed, and she was eating lunch in the cafeteria with her peers. (P-5, p. 56-57) The speech/language/communication report states that Student "responds to music and singing and tolerates hand over hand body patterning and choice making activities. She will hopefully show increased attention and comprehension levels after her summer program." (S-13) The OT report for June was virtually identical to the April report. (S-12) The PT report indicated that patterning of the body using 2 staff members was one of several therapeutic techniques used with Student during her two 60 minute sessions per week of PT. Student was continuing to work on ambulation, and by June 2003, was able to ambulate, with assistance, approximately 50 to 75 feet.

38. Student once again attended the Active Healing summer program during the summer of 2003. There is no progress report on the record for that summer.

39. Student entered fourth grade in September 2003 under an IEP covering June 2003 to June 2004 that provided for essentially the same services (with adjusted goals and objectives) as prior IEPs. Progress reports issued in April 2004 state that Student was making "very slow progress" in the inclusion setting. Student was exhibiting self-stimulating behaviors much of the time, with the maximum time observed without such behavior being 3 to 5 minutes. Student was showing increased vocalizations so that it was often necessary to remove her from the classroom for a sensory break. (P-5 p. 63) The progress reports for June 2004 generally showed slight progress toward her annual goals. (P-5, pp. 68-71)

40. In a letter dated June 14, 2004, Karl Kuban, M.D., Student's neurologist at the Floating Hospital for Children, stated that he is "in support of [Mother's] request to send her daughter to the Active Healing Program for 3 mornings per week during the academic school year so that [she] will be able to attain her maximum potential." This recommendation was based on Mother's report to Dr. Kuban that Student had benefited greatly from Active Healing elements integrated into her school day, that the amount of Active Healing techniques had declined, and that Student had regressed

during the past year in alertness, visual attention, gross motor skills, and strength. Dr. Kuban did not indicate that he had examined Student prior to writing this letter. (P-1)

41. Also on June 14, 2004, Mother and the School agreed that Student was to be evaluated at North Shore Children's Hospital and the Floating Hospital for Children. As of the commencement of the hearing, appointments had been scheduled, but evaluations had not been completed and/or reports had not been written. (S-2)

42. Student's IEP for June 2004 through June 2005 mentions that Mother "would like to see a continuation of the summer program…to include 90 hours during school time." The IEP otherwise is similar to prior IEPs, calling for an inclusion fourth grade placement with OT, PT, speech/language therapy, hippotherapy, and music therapy as related services. The IEP mentions use of a "sensory diet" as one accommodation, but does not specifically refer to techniques imported from Active Healing, and does not provide for services on the premises of Active Healing. (P-5)

43. At present, Student's special education liaison, PT and OT believe that Active Healing techniques do not benefit Student generally, and that some techniques, including rotary movements, are potentially harmful to children who, like Student, have a history of seizures. (Clark, Costanza, Lombara)

## FINDINGS AND CONCLUSIONS

Based on the evidence presented at the hearing, as well as the applicable law, I conclude that the Parent should receive the relief requested, that is, a trial placement at Active Healing for the period requested or other period as agreed by the parties. Since the trial of the Active Healing program that was requested, and that I am ordering, is in the nature of an extended evaluation and not a placement, no "stay-put" rights will attach. See 603 CMR 28.05(2)(b). My reasoning follows.

**Legal Framework**

The FAPE Standard

The parties agree that Student is a school-aged child with a disability who is eligible for special education and related services pursuant to the IDEA, 20 USC Section 1400, et seq., and the Massachusetts special education statute, G.L. c. 71B ("Chapter 766"). Therefore, Student is entitled to a free appropriate public education (FAPE) as defined in federal and state law.

The IDEA defines FAPE as special education and related services that (A) are provided at public expense and under public control; (B) meet the standards of the state educational agency; (C) include an appropriate preschool, elementary, or secondary school education; and (D) are provided in conformity with a properly developed IEP. 20 USC Sec. 1401; 34 CFR Sec. 300.13. The state statute defines FAPE as special education and related services that conform to the IDEA and its regulations and also

"meet the education standards established by statute or...by regulations promulgated by the Board of Education." G.L. c. 71B, Sec.1.

In general, FAPE encompasses substantive appropriateness, least restrictive environment (LRE) considerations, and conformity with the IDEA's procedural requirements. Substantively, federal courts have interpreted FAPE to mean an IEP and services that provide "significant learning" and confer "meaningful benefit" on the student via "personalized instruction with sufficient support services to permit the child to benefit educationally." Hendrick Hudson Bd. of Education v. Rowley, 458 U.S. 176, 188-9, 203 (1992); see also Burlington v. Mass. Dept. of Education, 736 F.2d 773, 788 (1st Cir. 1984). The IEP must be tailored to the unique needs of the disabled child, and must be "reasonably calculated to provide 'effective results' and 'demonstrable improvement' in the educational and personal skills identified as special needs." 34 C.F.R. 300.300(3)(ii); Lenn v. Portland School Committee, 998 F.2d 1083 (1st Cir. 1993), citing Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991) and Burlington, 736 F.2d at 788. Some federal courts have held that "effective results" and "demonstrable improvement" should be measured in light of the student's individual potential. See, e.g., Houston Independent School District v. Bobby R., 200 F.3d 341 (5th Cir. 2000). On the other hand, the IDEA does not require districts to maximize a student's potential, but rather to assure access to a public education and the opportunity for meaningful educational benefit. Lenn, 998 F.3d at 1091; G.D. v. Westmoreland School District, 930 F.2d 942 (1st Cir. 1991).

In Massachusetts, the Department of Education (DOE) has issued a memorandum analyzing the effect of the Commonwealth's adoption of the federal FAPE standard. See Massachusetts DOE Administrative Advisory SPED 2002-1: *Guidance on the change...from "maximum possible development" to "free appropriate public education" ("FAPE"), Effective January 1, 2002* (November 20, 2001) ("DOE Advisory") In this memorandum, DOE has commented that "court decisions make clear that FAPE is not a minimal or trivial standard." Id. Moreover, according to DOE, one of the Legislature's intentions in amending Chapter 766, in addition to adopting the federal FAPE standard, was to bring students with disabilities within the scope of the Massachusetts Education Reform Act, which "underscores the Commonwealth's commitment to assist all students to reach their full educational potential. Improving educational outcomes for students with disabilities is a goal of the state and federal special education laws, and improving educational outcomes for all students, including students with disabilities, is central to education reform" Id.

Under both federal and state law, FAPE requires schools to educate eligible students in the least restrictive environment, i.e., to the extent appropriate, with children who do not have disabilities. 20 U.S.C. 1412(5)(A).

Finally, FAPE also entails complying with the procedural requirements of the IDEA. These requirements, among other things, are designed to ensure that IEPs are written by duly constituted TEAMs, with meaningful parental participation, and that services are delivered in a timely manner. Roland M., 910 F.2d at 994 (citations omitted). On the

other hand, technical or de minimis violations that do not deprive the child of FAPE do not entitle parents to compensatory relief. Id.

If parents of an eligible disabled child can prove that their district's IEP and services do not provide FAPE, they may be reimbursed for the costs of unilaterally obtaining a private program or services, if they also can prove that the private services are appropriate. 20 USC Sec. 1415 (d)(2)(H), School Committee of Town of Burlington v. Dept. of Education of Mass., 471 U.S. 359, 369-70 (1985)

**Discussion**

Here, the parties basically agree on Student's profile. The parties also agree that Student needs major modifications and accommodations in the school setting, as well as intensive physical, speech/language and occupational therapies. Although the School recently has raised the issue of whether Student needs a more restrictive setting than the inclusion placements she has had since beginning her school career, there is no proposed IEP or formal proposal for anything other than an inclusion program for Student. The major substantive dispute is whether Student needs additional services, namely, the Active Healing program as proposed by Mother, in order to receive FAPE.

This case differs from the typical situation where a parent is requesting a service in addition to those listed on the student's IEP. In most such cases, the school asserts that its program is reasonably calculated to provide FAPE, and that the parent's proposed addition is unnecessary, and, perhaps, inappropriate. To prove its position, the school must demonstrate that the IEP as constituted addresses all of the student's identified special needs and that the student has made or undoubtedly will make effective, meaningful progress without the extra service. Further, even if a school is ultimately found liable for providing additional services, in general, the school is required to use its own resources or DOE-approved public or private providers.

Here, matters are somewhat more complicated. In this case, the school district, Manchester-Essex, acknowledges Student's regression and/or minimal progress since approximately late 2001 with the IEPs and placement provided by the district. Indeed, Manchester-Essex has explored alternative placements, although it has not made a formal proposal for such. Further, Manchester-Essex has rejected Mother's proposal for supplemental services at Active Healing, on the grounds that the program is unapproved, unaccredited, and Mother has produced no standardized assessment by a properly credentialed professional to show its benefit to Student. Nonetheless, the district has, year after year, paid for summer programming at Active Healing, accepted training and/or consultation from Sargent Goodchild, and, to a greater or lesser extent, incorporated elements of the Active Healing program into Student's program during the school year. At least one of Student's TEAM members, Jane Clark, opined that the School supported Student's attending Active Healing because of frustration with her

regression and the sense that there was no other "acceptable" program.[1] (Clark) However, other TEAM members noted in progress reports that Student responded well to the Active Healing summer program, as well as to patterning and other techniques that were incorporated into her school day. In any event, the School's motivation for including the Active Healing program in Student's IEP is immaterial; the School is bound by its own IEPs, regardless of the varied opinions of TEAM members.

This case poses a real dilemma. The School's argument that the BSEA should not put its imprimatur on an unapproved, unaccredited program in the absence of any expert testimony whatsoever as to that program's appropriateness or benefit to the Student is very persuasive.[2] On the other hand, it seems manifestly unfair to penalize Mother now for relying on the School's longstanding past endorsement of the Active Healing program in the form of payment for summer programming, consultation with Sargent Goodchild, and adoption of methodologies, particularly where the School had not offered other extended year services, cannot point to evaluations of its own that show the Active Healing program to be inappropriate; where at least some of the Active Healing methodologies are the same or similar to standard OT or PT techniques; and where contemporaneous progress reports from more than one provider state that Student benefited from the Active Healing interventions.

Although not precisely analogous, this situation can be viewed as similar to one in which a parent uses self-help, i.e., unilaterally places a child in an approved (or unapproved) program because the school has not offered an appropriate IEP, and so is potentially entitled to reimbursement for the costs of such self-help, if the services are appropriate. 20 USC Sec. 1415 (d)(2)(H), School Committee of Town of Burlington v. Dept. of Education of Mass., 471 U.S. 359, 369-70 (1985). To qualify for reimbursement, a parent's placement need only be "appropriately responsive to [a student's] special needs;" so that the student can benefit educationally. Matthew J. v. Mass. Dept. of Education, 989 F. Supp. at 387, 27 IDELR 339 at 343-344 (1998), citing Florence County School District Four v. Carter, 510 US 7, 13 (1993); Doe v. West Boylston School Committee, 28 IDELR 1182 (D. Mass., 1998); In Re Gill-Montague RSD, BSEA #01-1222 (Crane, August 2001).

Here, it is the School that repeatedly has endorsed the unapproved program at issue. And, while the Active Healing program is not Chapter 766 approved, there has been no evidence presented that it was not, in fact, "appropriately responsive to [Student's] special needs" in the past. The remaining question is whether the Active Healing program is currently appropriate for Student or whether Manchester-Essex was correct in declining to include the program in Student's most recent 2004-2005 IEP.

[1] It is not clear whether Ms. Clark meant that there was no other program that Mother would accept or that that there was no other program that was appropriate. In any event, there is no evidence that any other program was offered.

[2] I give little weight to the testimony of the School's PT as to the efficacy of Active Healing, as she did not begin working with Student until after Student had begun regressing, and had never implemented the various Active Healing strategies. As for the OT, her testimony in this regard is undercut by the written statements of the former COTA whom she supervised, Barbara Marshall, to the effect that Student was helped by Active Healing methodologies.

There is nothing on the record that indicates that the program is any less appropriate for Student than it was in the past when Student's therapists felt it was helpful, particularly where there has been no substitute offered. Fortuitously, the relief Mother seeks, a 12-week trial of the Active Healing program for approximately three hours per day, three days per week, (or such other time as the parties may agree) should inform the parties further on the issue of whether the Active Healing program will meet Student's needs, particularly if appropriate evaluations and observations are conducted. Since Student's occupational therapist has suggested that some aspects of the program might be medically contraindicated for Student, Parent should provide Manchester-Essex with current information from Student's physician that clarifies whether Student can participate in some or all of the program and whether she requires any adjustments or modifications. Since the trial of the Active Healing program that was requested, and that I am ordering, is in the nature of an extended evaluation and not a placement, no "stay-put" rights will attach. See 603 CMR 28. 05(2)(b) 5. Finally, I note that it is highly unusual to order a trial of an unapproved program such as Active Healing, and is here dictated by the unique circumstances of this case.

## CONCLUSION AND ORDER

Based on the foregoing, I order the following:

1. Manchester-Essex shall immediately arrange for and fund a trial for Student to spend partial days, no more than three days per week, at the Active Healing program, for a period not to exceed twelve weeks, unless the parties jointly agree to a different schedule. Manchester-Essex shall be responsible for transportation.

2. Mother shall immediately provide Manchester-Essex with medical documentation of Student's medical fitness to participate in the trial and of any conditions and limitations on that participation.

3. The trial period shall be conducted as an extended evaluation consistent with 603 CMR 28. 05(2)(b).

4. No "stay-put" rights attach to this Order.

By the Hearing Officer:

[signature]
Sara Berman

April 1, 2005
Date

COMMONWEALTH OF MASSACHUSETTS
BUREAU OF SPECIAL EDUCATION APPEALS

EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

**Effect of the Decision**

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must seek such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

**Compliance**

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

**Rights of Appeal**

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A. *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

**Confidentiality**

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

**Record of the Hearing**

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.