UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MANCHESTER ESSEX REGIONAL SCHOOL DISTRICT SCHOOL COMMITTEE<br>Plaintiff<br><br>v.<br><br>BUREAU OF SPECIAL EDUCATION APPEALS of the MASSACHUSETTS DEPARTMENT OF EDUCATION, MASSACHUSETTS DEPARTMENT OF EDUCATION, and PATRICIA SPELLMAN as Parent and Next Friend of D.T.<br>Defendants | Civil Action No.<br>05-10922-NMG |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Manchester Essex Regional School District, and moves this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for Summary Judgment in its favor. As grounds therefore the Plaintiff states that the final decision issued by the Bureau of Special Education Appeals of the Massachusetts Department of Education was contrary to law, unsupported by the weight of the evidence, contained significant errors and ought to be set aside.

The Plaintiff submits the attached Memorandum of Law and Concise Statement of Material Facts in support of its Motion.

WHEREFORE the Plaintiff respectfully requests that this court grant its Motion and enter judgment in its favor.

Date: February 28, 2006

Respectfully submitted,

The Plaintiff,

Manchester Essex Regional School District

By its attorneys,

SULLIVAN & NUTTALL, P.C.

*/s/ Thomas J. Nuttall*

Thomas J. Nuttall
BBO No.: 546940
1020 Plain Street, Suite 270
Marshfield, MA  02050
(781) 837-7428

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

Date: February 28, 2006

*/s/Thomas J. Nuttall*

Thomas J. Nuttall

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MANCHESTER ESSEX REGIONAL SCHOOL ) <br> DISTRICT SCHOOL COMMITTEE ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> BUREAU OF SPECIAL EDUCATION ) <br> APPEALS of the MASSACHUSETTS ) <br> DEPARTMENT OF EDUCATION, ) <br> MASSACHUSETTS DEPARTMENT ) <br> OF EDUCATION, and PATRICIA SPELLMAN ) <br> as Parent and Next Friend of D.T. ) <br> Defendants ) <br> ) | Civil Action No. <br> 05-10922-NMG |

## PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Manchester Essex Regional School District, pursuant to Local Rule 56.1, and states that the following material facts are not in dispute:

The Student:

1. The parties do not dispute that D.T. (hereinafter "Student') is a student with disabilities within the meaning of the Individuals with Disabilities Education Act ("IDEA") or that she is entitled to special education services. Administrative Record (hereinafter "AR") at 44.

2. At the time of the Bureau of Special Education Appeals hearing, the Student had been enrolled in the Manchester-Essex Regional School District (hereinafter "Manchester Essex" or "the District") since preschool. Id. at 36. The Student attended Essex

Elementary and Middle School from kindergarten through fourth grade. Id. During that time she was placed in an age appropriate regular education classroom for most of the school day, with various modifications and accommodations to help her participate in classroom activities. Id. Related services, including occupational therapy, physical therapy and speech therapy were provided in the classroom and as "pullouts" from the classroom. Id.

3. At the time of the hearing, during the 2004-2005 school year, the Student attended a fourth grade regular education classroom at the Essex Elementary School. Id. at 37. At all relevant times, Patricia Spellman, the Student's mother (hereinafter the "Parent") was committed to the Student being as fully included as possible in the regular education setting. Id. at 36, 202.

4. The Student's Individual Education Program ("IEP") for the 2004-2005 school year called for the Student to receive speech and language therapy twice per week for thirty minutes, physical therapy twice per week for sixty minutes, hippotherapy once per week for sixty minutes, and music therapy once per week for sixty minutes. Id. at 202. Additionally, Student received occupational therapy in her regular education classroom for thirty minutes per week and had a one-to-one aide who accompanied her at virtually all times. Id.[1]

5. Student's IEP for the 2004-2005 school year described the Student as follows:

> Student has a chromosomal anomaly called Wolf-Hirschorn Syndrome, which significantly affects her cognitive, motor, neurological, sensory, and communicative functioning. Specifically, Student needs assistance to walk. She has

---

[1] The Student's mother did not dispute the special education services or placement as set forth in the IEP. As stated by the Hearing Officer, "the major substantive dispute is whether the student needs additional services namely the Active Healing program, as proposed by the mother, in order to receive FAPE. AR at 13.

> very poor vision and limited eye muscle tone. Student requires sensory stimulation and hand-over-hand assistance to grasp classroom tools like pens or markers. Student is learning how to eat and drink with assistance and gets supplemental nutrition via a G-tube. Student is not toilet trained and is fully dependent for all self-care. Student has sensory issues including tactile defensiveness and needs a "sensory diet" throughout the school day to enable her to handle classroom materials, and remain alert, focused and awake. Student is non-verbal, but can communicate her needs and express pleasure or discomfort with vocalization. She performs inconsistently with assistive communication devices, and requires physical cues and hand-over-hand assistance to use them. Student has made progress with her IEP goals since entering school, but that progress is very slow.

Id. at 202.

6.  Beginning with the summer of 2000 following the Student's kindergarten year, the Student attended a seven week summer program at a provider known as Active Healing and formerly known as Estin & Goodchild, LLC. Id. at 37. The Manchester-Essex School District funded the Student's participation in the summer program. Id.

Active Healing (f/k/a Estin & Goodchild, LLC)

7.  Active Healing is a program which describes itself in its brochure as follows: "Active Healing, Inc. is dedicated to helping children with developmental differences and brain injuries live healthier and better lives." Id. at 58. Active Healing's executive director is Sargent L. Goodchild, Jr. Id. at 56. Mr. Goodchild's resume states he is " . . . president of a neurodevelopmental consulting firm committed to the neurological integrity of children . . ." Id. at 59. Mr. Goodchild's only degree is a bachelor of arts in political philosophy. Id. It is undisputed that he has no nationally or state recognized certification in any field related to special education, physical, occupational or speech therapy, or any other education, health or rehabilitation field. Id.

3

8. The parties stipulated at the commencement of the hearing that Active Healing is not a Chapter 766 approved provider and that Sargent Goodchild has no degree or certification in any field related to special education, physical, occupational or speech therapy, or any other education, health or rehabilitation field. Id. at 38.

The Student's Attendance at Active Healing

9. The Student attended Active Healing at the District's expense during the summers of 2001, 2002 and 2003 for a seven week program each summer. Id. at 37.

10. At the end of the summer of 2001, in a report dated August 9, 2001, Sargent Goodchild claimed the Student made "impressive gains" and had increased her average neurological age by 1.7 months. Id. at 65.

11. During the 2001-2002 school year, the Student's Team consulted with Sargent Goodchild and began incorporating some of his techniques into the Student's occupational therapy sessions. Record Transcript, Vol. I, at 38. Among the various techniques employed by Active Healing staff was "patterning" which entails two or more persons moving the student's arms, legs and body in particular sequences. Id. at 58, 98. Some of the patterning techniques used by Active Healing are similar to those routinely used in physical therapy and occupational therapy. See id. at 115, 86.

12. During the winter of 2001, the Student had an episode of seizures. Her teachers noted a "loss of previously learned skills and a decreased ability to attend and learn new skills." AR at 40, 236.

13. The Student attended Active Healing again during the Summer of 2002. AR at 66. In his Summary of Results dated September 2, 2002, Sargent Goodchild wrote:

> "[Student's] chronological age at the onset of the program
> was 8 years 7 months old. Her functional neurological age

4

at this time was 7.89 months." "During the seven week course, [Student] received a total of 91 hours of services. Over the course of that time her neurological age advanced to 9.03 months.

Id.

14. On October 21, 2002, at the Student's mother's request, the District held a Team Meeting to discuss using Sargent Goodchild's services and/or techniques within the school setting. Id. at 230. At the meeting, Mr. Goodchild reportedly proposed a program to increase the Student's awareness of her surroundings, expand her visual acuity, improve consistency in her choice making, and reduce bruxism. Id. At the Team's request, Mr. Goodchild performed an "assessment" of the Student's current neurodevelopmental function. Id. Team members were invited to observe the assessment. Id.

15. Sargent Goodchild conducted the assessment on October 29, 2002. Id. at 230, 232. Team Members including Joseph Mascola, Manchester Essex's Director of Student Services, observed.[2] Id. at 125, 127. Mr. Mascola testified that he observed the following:

> We went into a back room, [Student] was on a mat and all of the lights were put out and Mr. Goodchild held up a sharp light, a one hundred watt bulb and flashed it in her eyes for three quarters of a second, I think he said, and then off for five or six seconds and then back on. [He] did that for a while and described what he was doing." Record Transcript, Volume I, at 129.

> There was something called, China Doll Method Effect, . . . he moved [the Student's] head back and forth and I think the intent was to keep the eyes steadily focused. I'm not sure that I observed that happening. Id. at 130.

---

[2] Mr. Mascola has a bachelor's degree in economics, masters degree in special education and has worked for twenty years in special education, the last fifteen years of which he has been a Special Education Administrator. Record Transcript, Vol. I, at 1224-126.

He looked at her startle reflex. He got a (inaudible) jug and a stick, I believe, and snuck up –I don't want to say, snuck. He went behind [the Student] as he had her sitting and hit the jug up to four times. I believe on one of them I did see her eyes blink or close. I did see that. As a matter of fact, she had said something, but otherwise it was known, I think as startle reflex. All the time he was doing this he was kind of recording her age level. On that one I think he said it was functional. I asked what he meant by functional. He said that it was there. . . he also did a Babinski reflex, I think, which I really don't know, but I think he rubbed the bottom of her foot and again I don't think there was any observable change but he recorded it as again functional. So you know those are the kinds of things that I saw. Then he did a cognitive piece. I think [the Student] was laying on her back and he held up a picture of a bald eagle and a [secretary] bird, and held one up[secretary bird], bald eagle, and did that eight or ten times and then held them both up at the same time and asked her to say which one was the secretary bird. [The Student] was on her back and in a, you know, you know like a four month old would be her arms and legs were kind of moving, kind of not moving. I'm not sure if I saw movement towards one or the other, but he did and he acknowledged a correct answer. I remember clearing saying, Sarge, how did you determine that that was a correct answer and he said by her movement toward the card. He did it again with a snowy owl and the secretary bird. He did mention he had French cards, German cards and, I don't remember, Spanish cards I think that he used with her, that was part of his cognitive approach to stimulate her. Since I guess I didn't see that behavior was that she was eliciting, I asked what response do you get and he said sixty percent, that time he got sixty percent. I think he just said that that's the correct response that he did get. Again he was recording on sheets. He may have done some other things. Then we went into the back room there was another room and he had a long, about as long as this table, ramp and he placed her on the ramp and I believe we were looking to see her roll over. Again, she was on her back. I don't think she moved. She was moving her arms a little bit, moving her head a little bit, but I don't think we saw her roll over. He did take her legs and put it to the center line and then tipped them a little bit farther and I think the weight of gravity turned her over. At that point he said she's sliding, that's the beginning of learning. I had

> these quotes written down so I remember them pretty clearly. ... <u>Id</u>. at 134.

16. On October 29, 2002, following the completion of the aforementioned assessment, Mr. Goodchild wrote a report finding that the Student exhibited "ontogenetic abilities of the average 8.4 month old child. . ." which represented a loss of function since her summer program ended." AR at 232. Mr. Goodchild attached his "ontogenetic findings" and recommended that the Student follow the neurodevelopmental program guidelines set forth in a document dated October 21, 2002. <u>Id</u>. at 232-234.

17. On December 10, 2002, the District notified the Student's mother in writing that it was declining her request for the provision of services by Estin & Goodchild." <u>Id</u>. at 230-231. In refusing to support the mother's request for services from Active Healing, the District stated it questioned the proposed neurodevelopmental therapy because:

> Mr. Goodchild is not certified in the state of Massachusetts to provide therapeutic services. Mr. Goodchild does not hold a degree from an approved institution in a field of rehabilitative therapy. Estin and Goodchild, LLC is not a Massachusetts State approved program. The program does not employ standardized assessment tools as used by other therapists. Team members could not identify the benefit to the student after she received the therapeutic interventions. Team members could not identify functional behaviors as reported by the examiner. Team members could not identify a rate of response by the student as observed by the examiner. Team members were unable to identify or independently confirm statements of progress on student growth made by the examiner either specifically for [the Student] or in general for all students."

<u>Id</u>. The District stated "it continues to propose to explore alternative therapeutic services and programs for [the Student]. <u>Id</u>.

Procedural History:

18. On June 9, 2004, the Student's mother filed a hearing request with the Bureau of Special Education Appeals. AR at 1-4. The mother's hearing request sought an order requiring the District to provide Student with nine hours per week of direct services from a particular private provider, Active Healing, during the 2004-2005 school year. Id.

19. A hearing was held on August 24, 2004 and February 23, 2005 and the Hearing Officer issued her decision on April 4, 2005.[3] Id. at 34. The sole issue for hearing, as defined by the hearing officer was, "[w]hether Manchester-Essex must provide Student with several hours per week of the Active Healing Program during the 2004-2005 school year in order to provide her with a free, appropriate public education. Id. at 35.

20. The parties stipulated that Active Healing (f/k/a Estin & Goodchild) is not a Chapter 766 approved provider and that Sargent Goodchild has no degree or certification in any field related to the special education, physical, occupational or speech therapy, or any other education, health or rehabilitation field. Id. at 38. The parties also stipulated that there are no IEP's in existence involving other students enrolled in any program operated by Estin & Goodchild or Active Healing; and that there were no observations of the student within the Estin & Goodchild or Active Healing program by any consultant or evaluator employed by the parent.[4] Record Transcript, Volume I, at 21.

---

[3] The parties did not receive a decision from the hearing officer until April of 2005 for a hearing request filed in June of 2004 and for a hearing that began on August 24, 2004. Federal regulations require that a final decision issue within forty-five (45) days of receiving the request for hearing. 34 C.F.R. 300.511(a)(1). Inexplicably, after the first day of testimony on August 24, 2004, the hearing did not resume for short rebuttal testimony from one witness until February 23, 2005. BSEA Hearing Rules require that "[t]o the extent possible, the Hearing Officer shall ensure that hearings requiring multiple days are held on dates close to one another and that delays do not occur between hearing days." BSEA Hearing Rule II(A). The delay in this case was clearly contrary to the spirit of Rule II(A) particularly where the case concerned services in dispute for the 2004-2005 school year.

[4] The Decision misstates this part of the stipulation. *Compare* AR at 38, ¶12 *with* Record Transcript, Vol. I, at 20-21. The Decision states "[t]he parties also have stipulated that there are no other students from Manchester-Essex whose IEPs call for services at Active Healing." See AR at 38, ¶12 (decision stating stipulations). The actual stipulation, however, was that there were no other students enrolled at Active

The Hearing:

21. During the hearing, the Parent did not present any testimony from any provider from Active Healing. Record Transcript, Volumes I and II. The Parent presented no testimony as to the benefit to the Student with respect to the Student's attendance at Active Healing.[5] Id.

22. To the contrary, the District provided testimony showing that Active Healing provided no benefit to the Student. Id. at 39, 51, 66, 72. Jane Clark, a special needs teacher for Manchester Essex, testified that she is a certified special needs teacher for kindergarten through third grade and that she had worked as the Student's "liaison" for five years. Id. at 72. Ms. Clark testified, "My responsibility is as [the student's] liaison to, you know, run her yearly meetings, to oversee her program and to, you know, implement any modifications, accommodations within the inclusion setting. I work with the classroom teachers and with the service providers to implement her program." Id. Ms. Clark further testified as follows:

> Q: Did you feel that they [components of Active Healing program] worked for [the Student?]
>
> A: I feel that some of the things that we were doing, which were sensory motor, a lot of the sensory motor type activities that have been done all along that were not a lot different than what he [Sarge Goodchild] had showed us did benefit her as far as focus, as far as attention. I have not in the past year, two years, seen any carry over into her daily inclusion in the classroom, I have not seen it.

Id. at 39.

---

Healing, not just no other students enrolled from Manchester-Essex. See Record Transcript at 20-21 (Attorney Nuttall stating stipulation on the record).

[5] The Parent represented herself and did not testify. She submitted a statement at the beginning of the hearing about which the hearing officer stated, after objection from the District's counsel, that she would treat the statement "as simply a statement of the Parent's position and I understand that it's not a presentation of fact, . . ." Record Transcript, Vol. I, at 14. Likewise, statements made by the Parent during her closing argument are not evidence.

Ms. Clark further testified that there was no "carryover" with vision therapy and that, with respect to vision therapy, "I can't say honestly that I see any difference." Id. at 51, 60. Ms. Clark testified that it was her opinion that Active Healing was not an appropriate program for the Student. Id. at 66.

23. Other witnesses for the District testified that some components of the proposed program could be harmful to the student. Id. at 93 and 116. Jill Costanzo, the Student's occupational therapist, testified that the rotary movements recommended by Sargent Goodchild were contraindicated in the Student due to previous seizure history. Id. at 93. Ms. Costanzo is a licensed, registered occupational therapist and a certified early intervention therapist. Id. at 76

24. Amy Lombara, the Student's licensed physical therapist employed by the District, testified that the vision therapy recommended by Sargent Goodchild was contraindicated in children with a history of seizure disorders. Id. at 116.

The Hearing Officer's Decision:

25. On April 1, 2005, the Hearing Officer issued a decision in which she ordered Manchester Essex to arrange for and fund a "trial period" for the Student at Active Healing for twelve weeks. AR at 48. "The trial period shall be conducted as an extended evaluation consistent with 603 CMR28.05(2)(b)."[6] Id.

Date: February 28, 2006                Respectfully submitted,

The Plaintiff,

Manchester Essex Regional School District

---

[6] 603 CMR 28.05(2)(b) provides for an extended evaluation period where the team finds the "evaluation information insufficient to develop an IEP . . ." Under such circumstances the team, with the parent's consent, may agree to an extended evaluation. The regulation further provides that " the extended evaluation may extend longer than one week, but shall not exceed eight school weeks." 28.05(2)(b)(4).

By its attorneys,

SULLIVAN & NUTTALL, P.C.

/s/ Thomas J. Nuttall
_____

Thomas J. Nuttall
BBO No.: 546940
1020 Plain Street, Suite 270
Marshfield, MA 02050
(781) 837-7428

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

Date: February 28, 2006           /s/Thomas J. Nuttall
                                  _____
                                  Thomas J. Nuttall